**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

**CIVIL CASE NO. 3:05cv148**

| | |
|---|---|
| **ANDREW MARK BREEN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | <u>**MEMORANDUM OF DECISION**</u> |
| **vs.** ) | <u>**AND ORDER**</u> |
| ) | |
| **JAMES PENDERGRAPH, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| _____) | |

**THIS MATTER** is before the Court on the Defendants' Motions for

Summary Judgment [Docs. 32, 33].

**I.      Procedural History**

In this civil rights action, the Plaintiff Andrew Mark Breen alleges that

he was deprived of adequate medical care while held as a pretrial detainee

in the Mecklenburg County Jail ("Jail").  The Plaintiff brought suit against

the Defendants Mecklenburg County, James Pendergraph ("Sheriff

Pendergraph") in his official and individual capacities, John Does I, II, III,

and IV and Jane Doe in their individual capacities, Prison Health Services,

Inc. ("PHS"), and Peerless Insurance Company ("Peerless"), asserting

claims under 42 U.S.C. § 1983, as well as claims under state law.

Mecklenburg County was dismissed from this action on September 29,

2006. [Doc. 20]. The Plaintiff filed a notice of voluntary dismissal with

respect to the Doe Defendants in their individual capacities on December

3, 2007. [Doc. 38]. The remaining Defendants now move for summary

judgment. [Docs. 32, 33].


## II.     The Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law." Fed. R. Civ.

P. 56(c). The burden of establishing that there is no genuine issue of

material fact rests with the moving party. <u>Celotex Corp. v. Catrett</u>, 477

U.S. 317, 323 (1986).

In considering a motion for summary judgment, the Court must take

all of the evidence submitted by the non-moving party as true, and must

draw all reasonable inferences in the non-moving party's favor. <u>Anderson</u>

<u>v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986). To establish a genuine

issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find in its favor.  Id. at 248.  The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law.  Id.

Once the moving party presents evidence sufficient to carry its burden under Rule 56, the non-moving party may not rest upon its pleadings, but must affirmatively set forth, by affidavits or otherwise, "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  An entry of summary judgment is mandated if, "after adequate time for discovery and upon motion, [the non-moving party] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  In reviewing the evidence, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-52.

### III.    Facts

As required by Rule 56 of the Federal Rules of Civil Procedure, the Court will recite and consider the relevant facts in the light most favorable to the Plaintiff.

The Plaintiff was diagnosed with Parkinson's Disease in 1992. [Deposition of Andrew Mark Breen ("Breen Dep.") at 20].  Parkinson's Disease is "a disorder of the brain due to degeneration of an area called the substantia nigra." [Deposition of Dr. Steven Putman ("Putman Dep.") at 7].  In that area of the brain, a "chemical called Dopamine is synthesized, and with loss of the cells in that area of the brain . . . patients develop symptoms of stiffness, tremor, impaired mobility and balance problems. [Id.].  Parkinson's Disease is incurable, but can be managed through physical activity, medications, and surgical options. [Id. at 8].

Dr. Steven Putnam, the Plaintiff's neurologist, prescribed medications for the Plaintiff's Parkinson's Disease and epilepsy. [Id. at 22-23].  Dr. Putman was the only physician who has prescribed the Plaintiff medication for Parkinson's Disease since 2001. [Breen Dep. at 174; Putman Dep. at 22-23].  Dr. Justis was the Plaintiff's internist, or primary care physician. [Breen Dep. at 33; Putman Dep. at 22].  He does not prescribe any

medication for the Plaintiff's Parkinson's Disease symptoms; however, Dr. Putman copies Dr. Justis on the Plaintiff's medical records in order to keep him updated on the Plaintiff's medications and changes in his care. [Breen Dep. at 174; Putman Dep. at 23, 26, 44].

At the time of his arrest in May, 2003, the Plaintiff was taking Sinemet, Mirapex, and Comtan for his Parkinson's Disease and Depakote for epileptic seizures. Dr. Putman explained that Sinemet provides the building blocks to allow brain cells to make more Dopamine, while Mirapex stimulates dopamine receptors in the brain. [Id. at 25]. Dr. Putman prescribed Comtan to help the Sinemet work longer. [Id. at 26]. Dr. Putman testified that these medications "have a substantial symptomatic benefit," as they allow the Plaintiff to be functional and "get around normally." [Id. at 36].

At approximately 10:00 p.m. on Friday, May 9, 2003, the Plaintiff called the police after his wife bit him during a domestic dispute. [Breen Dep. at 26, 39-40]. The police arrived, spoke with both parties, and arrested the Plaintiff. [Id. at 45]. The Plaintiff told the officers that he needed to take his medicines with him, but they refused. [Id. at 46]. The

Plaintiff brought his daily dosage of pills to the Jail in an Altoids tin. [Id. at 48-49]. He also brought a prescription bottle of Depakote. [Id. at 120].

At 11:10 p.m., a Mecklenburg County employee and detention officer, badge number 1633, assisted the Plaintiff in completing a form entitled "PHS Correctional Care Receiving Screening." [Medical Records of Andrew Mark Breen from PHS ("Medical Records") at PHS-0001].[1] On this form, the Plaintiff disclosed that he was suffering from a bite wound, epilepsy, and Parkinson's Disease. [Id.]. He informed the detention officer that he was taking the medication Depakote under the prescription order of a physician. [Id.].

At 11:19 p.m. on May 9, 2003, Franks Spears, R.N., a PHS employee, performed the initial inmate screening and nursing assessment of the Plaintiff. [Medical Records at PHS-0002]. Spears documented that the Plaintiff's physicians were Dr. Putman and Dr. Peter Justis.[2] The

_____

[1]Elaine Gravitt, R.N. is the custodian of medical records for the Mecklenburg County Jail. She states in her affidavit that as the custodian, she has personal knowledge of the filing system for prison detainee and inmate medical records, and that the Medical Records submitted by the Defendant PHS are a true and accurate copy of the Plaintiff's entire medical record for the time period during his detention at the Meckenburg county Jail between May 9, 2003 and May 12, 2003. [Affidavit of Elaine Gravitt, R.N. ("Gravitt Aff.") at ¶¶ 10, 11].

[2]The Medical Records erroneously refer to the Plaintiff's physicians as "Dr. Putnam" and "Dr. Justice."

Plaintiff reported a history of seizures and Parkinson's Disease.  Given the Plaintiff's history of seizures, Nurse Spears notified the jail housing department that the Plaintiff was to have a lower bunk as a precaution. [Id.]. Other than Depakote, the Plaintiff claimed to be taking prescriptions for "Neuropax" and "Cocutane."  Nurse Spears gave the Plaintiff a dose of Depakote and sent the prescription bottle of Depakote to the Property section of the Jail.[3]  The Plaintiff was advised to have his other prescription bottles brought to the Jail ("Advised to have other Rx bottles b-t-j."). [Id.]. The Plaintiff did not contact any local friends or family and ask that his prescription bottles be brought to the Jail, although he did admit to calling friends and family in Connecticut.  [Plaintiff's Dep. at 72].

The Plaintiff's medications which were contained in the Altoids tin were confiscated, per PHS policy.  [Declaration of Loretta Pagan ("Pagan Dec.") at ¶¶ 4-5; Gravitt Aff. at ¶ 18].  When the Plaintiff realized that they were being confiscated, he informed Nurse Spears that they were for his Parkinson's Disease, that he could not function without them, and that he would be at risk of harm without them.  [Breen Dep. at 54, 55-56].   Spears

_____

[3]Plaintiff continued to receive regular dosages of Depakote during his stay in jail, although he refused at least one dose on Monday, May 12, 2003.   [Medical Records at PHS-0006-0007; Affidavit of Irene Dawson, LPN ("Dawson Aff.") at ¶ 4].

responded that the Plaintiff could not have those medications in the Jail, or words to that effect. [Id.].

On the morning of Saturday, May 10, 2003, a nurse employee of PHS spoke with the Plaintiff's pharmacy, Medco, which requested a release for the Plaintiff's medical records. [Medical Records at PHS–0005, PHS-0008, PHS-0028; Breen Dep. at 60-61, 83-84]. PHS had the Plaintiff sign an Authorization for the Release of Medical Records for Dr. Justis, Dr. Putman, and the Plaintiff's pharmacies. [Id. at PHS-0027; Breen Dep. at 89-90]. The nurse employee faxed a copy of the medical authorization signed by the Plaintiff to Medco and to Dr. Justis. [Id. at PHS-0008, PHS-0025].

On the morning of May 10, 2003, PHS received a fax from Dr. Justis' office, which included medical records that indicated that the Plaintiff had Parkinson's Disease and that as of his last office visit on March 18, 2003, his "current medications" included Sinemet, Mirapex, and Comtan. [Medical Records at PHS-0019-0023]. However, this office visit record does not indicate the dosage of Plaintiff's medications or the frequency at which he was taking them. Medco never provided PHS with any documentation

verifying that Medco filled prescriptions for the Plaintiff. [Gravitt Aff. at ¶ 21].

During the day on Saturday, May 10, 2003, the Plaintiff "was getting weaker and weaker" without his medications. [Breen Dep. at 73]. Breen asked a PHS employee for his medications later that night but was again told he could not have them. [Id. at 75]. The Plaintiff's symptoms, which are typically controlled by his medication, grew much worse. His tremors, which are typically lessened by his medications, increased to the point that they "were out of control." [Id. at 154]. In addition, his rigidity "symptoms got as bad as they can get." The Plaintiff was "[a]s uncomfortable as you can be." [Id. at 155]. The Plaintiff could not even stand up and sometimes was writhing on the floor. [Id.]

Additionally, the Plaintiff began to experience other symptoms which he typically does not have at all while on medications. For example, the Plaintiff began to experience a shuffling gait and "turning en block," which is turning with the neck and trunk rigid. Additionally, he began to suffer from muscle pain, joint and tendon pain, and dizziness. [Id. at 156, 161]. He also began to have a stooped or "forward-flexed" posture. [Id. at 161]. The denial of his medication made him unable to sleep, other than

occasional brief naps. [Id. at 157]. Without sleep, the Plaintiff could not get a rest from his other symptoms and therefore "was exhibiting symptoms all day." [Id.]. Being denied his medications also caused the Plaintiff to suffer extreme fatigue, which compounded with the lack of sleep was, in the Plaintiff's word, "murderous." [Id. at 163]. He testified that he had "[a]lmost complete loss of any voluntary movement." [Id. at 92].

On Sunday, May 11, 2003, a nurse employee of PHS documented that Nurse Laurie from Dr. Justis' office called regarding the Plaintiff's Parkinson's Disease medication. [Medical Records at PHS-0008]. Nurse Laurie reported that members of the Plaintiff's family had been calling Dr. Justis' office and "harassing" them about the Plaintiff's medications. Nurse Laurie advised that Dr. Putman handled the Plaintiff's Parkinson's Disease medications and gave the PHS nurse Dr. Putman's telephone number. The PHS nurse called Dr. Putman's phone number, but the office was closed. The PHS nurse then attempted to call Nurse Laurie again to obtain a fax number for Dr. Putman's office, but she received no response.

On Monday, May 12, 2003, at 8:45 a.m., a nurse employee of PHS faxed a release of medical records request to Dr. Putman's office. [Id.]. At 12:20 p.m. that day, Dr. Putman's office faxed to PHS the Plaintiff's

medical records, which verified that he had a prescription for Sinemet and Mirapex. [Id. at PHS-0015; Affidavit of Katherine Wisor, R.N. ("Wisor Aff.") at ¶ 9]. After receiving this fax, a PHS doctor ordered that the Plaintiff be given these medications. [Medical Records at PHS-0005; Wisor Aff. at ¶ 10]. Kathleen Wisor, R.N., a PHS employee, then set up Plaintiff's Medication Administration Record for him to receive Sinemet five (5) times a day and Mirapex four (4) times a day. [Medical Records at PHS-0018; Wisor Aff. at ¶ 11].

At approximately 1:00 p.m. on Monday, May 12, 2003, the Plaintiff either fell or fainted. The Plaintiff believed that he fainted because he was "just weak from not having my Parkinson's medication. I was under a lot of stress, and I hadn't been able to eat because I couldn't get to the food sometimes, and couldn't eat it sometimes unless someone helped me get it." [Breen Dep. at 142]. When he fell, the Plaintiff "took some bumps on landing" and also received some bruising. [Id. at 93, 132].

Nurse Wisor received a radio call at approximately 1:05 p.m. regarding the Plaintiff's fall. [Medical Records at PHS-0009; Wisor Aff. at ¶ 3]. Upon her arrival at the jail cell, Nurse Wisor found the Plaintiff lying on the floor on his left side, with his eyelids twitching. [Medical Records at

11

PHS-0009; Wisor Aff. at ¶ 4].  She assessed his vital signs and determined that the Plaintiff did not need emergency treatment by a physician as he was stable.  Nurse Wisor documented the Plaintiff's complaints, her observations, and her assessment of his condition in the Plaintiff's medical records.  [Id.].  By 1:20 p.m., Nurse Wisor observed that the Plaintiff was alert, oriented, and verbal.  He was transferred to the medical area of the Jail where he could be observed by medical personnel. [Wisor Aff. at ¶ 5].

While in the medical area, the Plaintiff again asked for his medications.  [Medical Records at PHS-0009].  However, his request was refused.  After being treated in the medical area, the Plaintiff was returned to his cell with a walker and his own shoes as a safety precaution. [Medical Records at PHS-0011; Wisor Aff. at ¶ 8].

The Plaintiff was released from custody later that day.[4]  The Plaintiff did not receive any doses of Sinemet or Mirapex prior to being released. [Gravitt Aff. at ¶ 27].

It took the Plaintiff "a couple of weeks" before he could get back to where he was physically prior to going to jail:

_____

[4]The parties dispute the time of the Plaintiff's release from jail, and the record is far from clear on this issue.  However, the Court need not address this factual dispute, as the timing of the Plaintiff's release – whether it was at 2:00 p.m. as alleged by the Defendant or 6:25 p.m. as alleged by the Plaintiff – is immaterial to the Court's analysis.

It was a challenging time for me for the simple
reason that my medication wasn't working the way it
should have because it had a big deficit to
overcome. And every day, movement was a huge
challenge, walking, standing, sleeping, you name it.
It took a couple of weeks before it got back to
where it was previously.

[Breen Dep. at 100].

Dr. Putman testified that the Plaintiff's medications for Parkinson's

Disease are easily and quickly identifiable by means of photographs and

other information available in the Physician's Desk Reference. He further

noted that these medications are not the type of medications subject to

abuse. [Putman Dep. at 48-49; 50-51, 53, 69]. Dr. Putman further testified

that physicians "don't like stopping the Parkinson's medicines abruptly,"

although he admitted that withdrawal responses are "exceedingly rare."

[Id. at 18].

Dr. Putman confirmed that being off the medications for a day or two

would result in tightening of the muscles and painful joints and tendons

"due to the loss of mobility and stiffness." [Id. at 58]. He further opined that

denial of medications could likely cause a person to suffer increased

symptoms of tremors, rigidity, slowness of movement, muscle tone, gait

freezing, sleep disturbances, as well as loss of the ability to walk. [Id. at

55-58]. He also opined that being denied his medications would cause the Plaintiff to be unable to hold a food tray or even a fork to eat his food. Finally, he noted that the denial of medication can cause a Parkinson's patient to suffer fatigue. [Id. at 57, 66]. Such symptoms can be exacerbated by stressful situations, such as being in jail. [Id. at 65]. However, Dr. Putman did note that the lack of medications would not be life-threatening or cause permanent impairment. [Id. at 36, 41].

## III. Analysis

### A. Claims Against Sheriff Pendergraph and Peerless Insurance Company

In his opposition brief to PHS's Motion for Summary Judgment, the Plaintiff states that he does not oppose the Motion for Summary Judgment filed by Sheriff Pendergraph and Peerless Insurance Company and chooses instead to pursue his claims solely against PHS. [Plaintiff's Memorandum of Law in Opposition at 17-18 n.9]. As the Plaintiff has indicated his intention to abandon his claims against respect to Sheriff Pendergraph and Peerless Insurance Company, these claims shall be dismissed.

**B.    Claim Against PHS**

The Plaintiff asserts that he was deprived of his constitutional right to adequate medical care in violation of 42 U.S.C. § 1983 as a result of an official policy, or custom or usage of PHS.  Specifically, the Plaintiff alleges that PHS has an official policy "that medications that are confiscated from inmates upon their being taken into custody in Jail Central are not returned to such inmates nor are such inmates allowed access to such medications." [Doc. 1, Complaint at ¶ 132].  Alternatively, the Plaintiff alleges that "the manner in which PHS's officials, officers, and employees are trained, including the design and implementation of training programs and the follow-up supervision of trainees, is a matter of policy," and that such training policy "has deficiencies relating to the provision of medical care and allowing inmates access to medication, which result from the fault of the final policy makers of PHS in their deliberate indifference to, or reckless disregard for, the constitutional rights of persons" such as the Plaintiff. [Id. at ¶¶ 133, 135].  The Plaintiff further alleges in the alternative that "the failure of PHS to provide adequate medical care to inmates, to provide them with their prescribed medications, or to allow them access to their medications has become sufficiently widespread to assume the

quality of custom or usage," and that this custom or usage caused the

deprivation of the Plaintiff's constitutional rights.  [Id. at ¶¶ 136, 141].

Section 1983 provides, in pertinent part, as follows:

Every person who, under color of any statute, ordinance,
regulation, custom, or usage, of any State . . . subjects, or
causes to be subjected, any citizen of the United States or
other person within the jurisdiction thereof to the deprivation of
any rights, privileges, or immunities secured by the Constitution
and laws, shall be liable to the party injured in an action at law,
suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  To prevail against PHS on his § 1983 claim, the Plaintiff

must show that he was "deprived of a right secured by the Constitution of

laws of the United States, and that the alleged deprivation was committed

under color of state law."  Austin v. Paramount Parks, Inc., 195 F.3d 715,

727 (4th Cir. 1999) (quoting American Mfrs. Mut. Ins. Co. v. Sullivan, 526

U.S. 40, 199 S. Ct. 977, 985, 143 L. Ed. 2d 130 (1999)).

"The Fourteenth Amendment right of pretrial detainees, like the

Eighth Amendment right of convicted prisoners, requires that government

officials not be deliberately indifferent to any serious medical needs of the

detainee."  Belcher v. Oliver, 898 F.2d 32, 34 (4th Cir. 1990); see

also Young v. City of Mount Ranier, 238 F.3d 567, 575 (4th Cir. 2001)

("Pretrial detainees are entitled to at least the same protection under the

Fourteenth Amendment as are convicted prisoners under the Eighth Amendment.") (footnote omitted).  "In order to establish a claim of deliberate indifference to medical need, the need must be both apparent and serious, and the denial of attention must be both deliberate and without legitimate penological objective."  Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999).  A prison official will not be held liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference."  Farmer v. Brennan, 511 U.S. 825, 837 (1994).

In Monell v. Department of Social Services, 436 U.S. 658, 690 (1978), the Supreme Court held that municipalities and other local governmental entities are "persons" within the meaning of § 1983. However, municipal liability will not lie solely on a theory of *respondeat superior*.  Monell, 436 U.S. at 691.  Rather, a municipality may be liable under § 1983 only when the municipality "causes the deprivation 'through an official policy or custom.'"  Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (quoting in part Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999)). It is, therefore, significant that Plaintiff has chosen not to pursue any claims

17

against any of the personnel who were charged with Plaintiff's medical care while in detention, but only to pursue his claims against PHS. As such, under Lytle and Carter, in order for the Plaintiff to survive summary judgment he must present a forecast of evidence that employees of PHS were recklessly indifferent to Plaintiff's health issues *and* that such reckless indifference arose from an official policy or custom of PHS.

"Municipal policy may be found in written ordinances and regulations, in certain affirmative decisions of individual policymaking officials, or in certain omissions on the part of policymaking officials that manifest deliberate indifference to the rights or citizens." Carter 164 F.3d at 218 (citations omitted). "Outside of such formal decisionmaking channels, a municipal custom may arise if a practice is so persistent and widespread and so permanent and well settled as to constitute a custom or usage with the force of law." Id. (quoting in part Monell, 436 U.S. at 691) (internal quotation marks omitted).

The Fourth Circuit has held that the principles of § 1983 municipal liability are equally applicable to a private corporation which has been sued under § 1983. See Powell v. Shopco Laurel Co., 678 F.2d 504, 506 (4th Cir. 1982) (holding private corporation not liable under § 1983 for acts of its

employee).  Thus, "a private corporation is liable under § 1983 *only* when an official policy or custom of the corporation causes the alleged deprivation of federal rights."  Austin, 195 F.3d at 728.

For the purposes of this motion, the Court will assume that the medications prescribed to the Plaintiff for Parkinson's Disease were important to treating his symptoms, and thus, his need for such medications was a serious medical need.  Accordingly, the only issue before the Court is whether PHS had an unconstitutional policy or custom or usage which resulted in the deprivation of the Plaintiff's constitutional rights.

In the present case, the PHS Pharmaceutical Operations Policy ("Policy") states, in pertinent part, as follows:

> No out side [sic] medication are accepted for use in
> jail without an order from the facility MD.  These
> medications are accepted only if current and [in a]
> properly labeled Rx bottle.

[Pagan Aff., Ex. A at ¶ 14].  This Policy prohibits a detainee from bringing outside medications to the jail unless the detainee has a "current and properly labeled" prescription bottle.  The Policy was created to ensure the health and safety of all inmates, including those inmates who bring unidentified pills or medication to the facility. [Gravitt Aff. at ¶ 7].  The

health and safety of inmates would be compromised if inmates were allowed to bring pills or medication into the facility without proof of the type of pills or that the inmate had a valid prescription for them. [Gravitt Aff. at ¶ 7; Pagan Aff. at ¶ 7].

Similar jail policies requiring the verification of outside prescriptions have been upheld against challenges that such policies constitutionally deprive inmates or detainees of their right to adequate medical care.  For example, in Calhoun v. Ramsey, 408 F.3d 375 (7th Cir. 2005), the plaintiff challenged the constitutionality of the county jail's policy which required medications be verified and approved by the jail's medical director before they could be administered to the inmate.  The plaintiff in that case attempted to have his medications verified prior to reporting to serve his jail time so that his medication schedule would be uninterrupted, but the jail refused his request.  The plaintiff argued that the jail policy's failure to allow for pre-verification of medication amounted to a deliberate indifference to his medical needs.  The Seventh Circuit rejected the plaintiff's argument, finding nothing in the policy's language which was "constitutionally suspect."  Id. at 381.

In <u>Garcia v. County of Bucks</u>, 155 F. Supp. 2d 259 (E.D. Pa. 2001), the plaintiff alleged that the defendants were deliberately indifferent to his medical needs when the defendants confiscated the plaintiff's diabetes medication upon his arrival at the jail. The court rejected the plaintiff's claim of an unconstitutional custom or policy, stating as follows:

> The initial confiscation of medication from Mr. Garcia alone is not actionable. Prison authorities "universally confiscate medications" from new inmates. <u>Dawson v. Kendrick</u>, 527 F. Supp. 1252, 1307 (S.D. W. Va. 1981). Because of their responsibility to provide proper medical care, prison authorities clearly have a legitimate interest in controlling the prescription and administration of medication to persons in their custody. Legitimate prisoner safety and prison security interests are also clearly implicated by inmate possession of even prescription drugs.

<u>Id.</u> at 267 n.12.

The Court finds the rationale of <u>Calhoun</u> and <u>Garcia</u> persuasive in the present case. Like the policies discussed in those cases, the Defendant's Policy in the present case reflects the legitimate interests that the Defendant has in controlling and administering medications within the Jail. The Policy does not provide for complete denial of access to medications; rather, it requires any outside medications to be verified before being administered to the inmate. For obvious reasons, without

such a policy in place, inmates would be able to distribute contraband to other inmates or take uncontrolled dosages of contraband themselves, thereby endangering both themselves and others.  Accordingly, the Court concludes that PHS's official written policy is constitutionally valid.

The Plaintiff's alternative claims of liability fail as well.  To sustain a claim of municipal liability for a lack of training, a plaintiff must show 1) that personnel "are not adequately trained 'in relation to the tasks [they] must perform,' and this deficiency is 'closely related to the ultimate injury,'" Lytle, 326 F.3d at 473 (quoting in part Canton v. Harris, 489 U.S. 378, 390-91 (1989)), and 2) that the "policymakers were aware of, and acquiesced in, a pattern of constitutional violations."  Lytle, 326 F.3d at 474 (quoting Canton, 489 U.S. at 397).  In the present case, the Plaintiff has failed to show how the training of PHS's employees was inadequate or how such lack of training led to his claimed injury.  Further, the Plaintiff has not shown a pattern of constitutional violations in depriving inmates of medications such that PHS was aware of any such violations.  In fact, Plaintiff has presented no forecast of evidence showing other instances from which the Court could conclude that other constitutional violations

occurred, much less that they formed a pattern of activity. Accordingly, the Plaintiff's claim for failure to train must fail.

Finally, the Court rejects the Plaintiff's contention that the failure of PHS to provide adequate medical care to inmates, to provide them with their prescribed medications, or to allow them access to their medications, has become sufficiently widespread to assume the quality of custom or usage. It is well settled in the Fourth Circuit "that 'isolated incidents' of unconstitutional conduct by subordinate employees are not sufficient to establish a custom or practice for § 1983 purposes." <u>Lytle</u>, 326 F.3d at 473. Rather, the plaintiff must show "'numerous particular instances' of unconstitutional conduct in order to establish a custom or practice." <u>Id.</u> In the present case, the Plaintiff has not forecast any evidence of other instances where medications were withheld from inmates with serious medical needs. Absent such evidence, the Plaintiff cannot establish "the sort of widespread and permanent practice necessary to establish a custom." <u>See</u> <u>id.</u>

The undisputed facts in the record demonstrate that PHS took steps to verify the Plaintiff's medications in this case. Because the Plaintiff's Depakote prescription was brought to the facility in a prescription bottle,

PHS officials were able to verify this medication quickly and administer doses of that medication to the Plaintiff. With respect to the medications contained in the Altoids tin, the Plaintiff was instructed to have the prescription bottles brought to the Jail so that the prescriptions could be verified. For whatever reason, the Plaintiff chose not to contact anyone locally to have these medications brought to him, although the Plaintiff admitted to having access to the telephone, as he made several calls to friends and family in Connecticut.

Additionally, PHS employees contacted the Plaintiff's pharmacy and Dr. Justis in an attempt to verify the Plaintiff's prescriptions. The medical records received from Dr. Justis indicated that as of March 18, 2003, the Plaintiff's medications included Sinemet, Mirapex, and Comtan, even though these records did not identify whether the Plaintiff was still taking those medications as of May 10, 2003. More importantly, these records provide no indication of the dosage of Plaintiff's medications or the frequency at which he was taking them. Without such information no proper administration of the medication could be made.

PHS also made attempts to contact Dr. Putman; however, because it was the weekend, his office was closed. Plaintiff presents no evidence

that there was an emergency number for Dr. Putman that PHS should have called or any other emergency means by which this information could reasonably have been obtained from Dr. Putman over the weekend. PHS was able to fax an authorization to Dr. Putman on Monday, May 12, 2003, and his records verifying the Plaintiff's prescriptions were received later that day.

While Plaintiff contends that PHS could have done more to verify his prescriptions earlier than Monday, May 12, 2003, and Plaintiff's forecast of evidence may well be sufficient to support a verdict that PHS and its employees acted negligently in attempting to verifying the Plaintiff's prescriptions, that is not the issue. The standard of deliberate indifference requires "more than ordinary lack of due care for the prisoner's interests or safety." Whitley v. Albers, 475 U.S. 312, 319 (1986). As the Fourth Circuit has noted, "[d]eliberate indifference is a very high standard – a showing of mere negligence will not meet it." Grayson, 195 F.3d at 695; Wynn v. Mundo. 367 F. Supp. 2d 832, 837 (M.D.N.C.) ("Mere negligence or medical malpractice is not sufficient to establish deliberate indifference."), aff'd, 142 Fed. Appx. 193 (4th Cir. Sep. 1, 2005). More importantly, since Plaintiff's action continues only against PHS it is insufficient for Plaintiff to present a

forecast of evidence that PHS employees "could have done more."  It is incumbent upon Plaintiff to present a forecast of evidence that the employees of PHS were recklessly indifferent to Plaintiff's health concerns and that this recklessness proceeded from official PHS policy or custom. See Lytle and Carter, supra.  It is on this second point that Plaintiff's evidence is lacking.  Interestingly, Plaintiff cites to the case of Bowers v. Philadelphia, 2007 U.S. Dist. LEXIS 5804 (E.D.Pa. 2007), to support the proposition that deprivation of Parkinson's medication for four days is evidence of reckless indifference.  In that case, however, the plaintiffs presented evidence of many other instances of harmful actions taken by the defendant so as to show a pattern of conduct that establishes a policy of deliberate indifference.  That is precisely the sort of evidence that is lacking in this case, which necessitates the entry of summary judgment for PHS.

　　　　For all of these reasons, PHS's Motion for Summary Judgment is granted.


**O R D E R**

**IT IS, THEREFORE, ORDERED** that Defendants James Pendergraph and Peerless Insurance Company's Motion for Summary Judgment [Doc. 32] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant Prison Health Services, Inc.'s Motion for Summary Judgment [Doc. 33] is **GRANTED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED**, and judgment shall issue simultaneously herewith.

**IT IS SO ORDERED.**

Signed: December 28, 2007

Martin Reidinger
United States District Judge